IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEVEN HICKMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-38 (MN) |
| | ) |
| RICHARD DONOVAN, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

Steven Hickman, Georgetown, Delaware – Pro Se Plaintiff

Nicholas D Picollelli, Jr., DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware – Counsel for Richard Donovan, Correctional Officer, CPL.

August 20, 2025
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

On January 10, 2022, Plaintiff Steven Hickman, who was at the time an inmate confined at the Sussex Correctional Institution (SCI) in Georgetown, Delaware, initiated this pro se action *in forma pauperis* under 42 U.S.C. § 1983 against Defendant Richard Donovan, Correctional Officer, CPL. (D.I. 1; D.I. 2; *see also* D.I. 12). Now before the Court are Plaintiff's motions for summary judgment (D.I. 60; D.I. 62), to which Defendant responded in opposition (D.I. 65), and Defendant's motion for summary judgment (D.I. 70), to which Plaintiff responded in opposition (D.I. 71; D.I. 77; D.I. 78). Also pending are four discovery motions requesting subpoenas filed by Plaintiff. (D.I. 68; D.I. 69; D.I. 74; D.I. 76). The Court addresses all pending motions below.

**I.    BACKGROUND**

    **A.    Plaintiff's Complaint**

The Complaint alleges that at SCI on April 21, 2020,[1] Defendant sexually violated, sexually assaulted, and raped Plaintiff. (D.I. 2 at 5). According to the Complaint, while performing a routine strip search, Defendant stated that there was a "big ball of cra[c]k cocaine[e] in [Plaintiff's] anal" cavity. (*Id.* at 6). Due to Defendant's statement, and his subsequent, continued insistence regarding what he had seen, Plaintiff's anal cavity was searched four more times. (*Id.*). The Complaint calls into question the credibility and sincerity of Defendant's initial statement regarding the ball of crack cocaine, as well as Defendant's continued insistence regarding what he had seen, based on Defendant's expression, tone, and demeanor. (*Id.*).

The first two subsequent searches were visual searches performed in front of eight or ten other correctional officers. (*Id.*). A drug sniffing dog was allegedly utilized during the third subsequent search. (*Id.*). The final search was performed in a hospital, without Plaintiff's consent,

---

[1]   In deposition earlier this year, Plaintiff acknowledged that the incident may have occurred on April 17, 2020, and not April 21, 2020. (D.I. 70-4 at 17-19).

utilizing a five-to-seven-minute, camera-guided examination of Plaintiff's anal cavity, during which Plaintiff was in handcuffs. (*Id*.). Following the final search at the hospital, Plaintiff asserted that he wanted medical treatment, but this request was denied; Plaintiff was told that he was fine and that he was "going to be sore after going through all that." (*Id*. at 7). Plaintiff admits that he "was under the influ[e]nce of h[eav]y drugs and alcohol" during the incident. (*Id*.). After the incident, SCI "put in a body scanner so what happened to [Plaintiff] wouldn't happen to any[one] else." (*Id*. at 9).

Plaintiff alleges that he sustained physical and psychological injuries from the incident, for which he receives ongoing physical and mental health treatment. (*Id*.). Plaintiff seeks $200 million from Defendant for utilizing false statements to cause Plaintiff to be sexually violated, sexually assaulted, raped, and denied medical treatment. (*Id*.). The Complaint indicates that Plaintiff filed a grievance concerning the incident and that the grievance process was completed. (*Id*. at 8). Enclosed with the Complaint is a copy of one grievance that requests "copies of reports," the date and content of which is largely obscured by a handwritten note regarding Plaintiff being denied access to medical records absent Court order. (D.I. 2-1 at 4).

### B. Plaintiff's Deposition

In deposition earlier this year, Plaintiff reiterated that Defendant told Plaintiff and other correctional officers during the April 2020 incident that Plaintiff had "something white in [his] anus, to be sarcastic, smart," as opposed to making the statement sincerely. (D.I. 70-4 at 26). Plaintiff also acknowledged that Defendant was not present for the final body cavity search at the hospital. (*Id*. at 95).

In deposition, Plaintiff was shown a copy of a different grievance, dated April 21, 2020, requesting $2.5 million and all medical bills paid for "sexual assault/rape caused by staff member" on April 17, 2020. (*Id*. at 148). This grievance describes the same events described in the

Complaint. (*Id*.). When shown the grievance, Plaintiff confirmed that it was the grievance he submitted about the April 2020 incident involving Defendant. (*Id.* at 105). Plaintiff also confirmed that this grievance was returned to him by an officer, and he was shown a copy of the associated return of unprocessed grievance. (*Id.* at 105-06). The return states that the matter "was referred for investigation to the Investigations Office" and instructs Plaintiff to write to his Unit Commander to "request that the actions of staff personnel be investigated." (*Id.* at 149). The return further instructs Plaintiff to appeal to the Operations Superintendent or Warden if he receives no response or is dissatisfied with the response of the Unit Commander. (*Id.*). In deposition, Plaintiff recalled waiting for the results of the Investigations Office's investigation, but he could not recall writing to the Unit Commander as instructed. (*Id.* at 107-08). Plaintiff also did not recall writing to the Operations Superintendent or appealing to the Warden. (*Id.*).

Plaintiff was shown a later grievance, dated January 3, 2022 (*id.* at 108-09), requesting "a settle[ment] agreement" for the civil claim arising from the incident in question (*id.* at 150). Plaintiff confirmed that he submitted this grievance and explained that he wrote that it was not a Prison Rape Elimination Act (PREA) complaint because he understood PREA to only apply to violations committed by inmates against other inmates. (*Id.* at 109). Plaintiff further confirmed that this grievance was returned to him unprocessed. (*Id.* at 110-11). The return states that the grievance raises rape, sexual assault, and sexual violation allegations that were already investigated. (*Id.* at 151-52). The return also states that "a settlement agreement in a civil case is beyond the scope of the grievance process. If you wish to pursue civil claims you may do so through an attorney or the court system." (*Id.* at 152). Aside from an unrelated grievance regarding a phone sheet, Plaintiff did not recall filing any other grievances, but he could not say definitively that he had submitted no other grievances. (*Id.* at 114-15).

3

Finally, Plaintiff was shown a letter, dated May 21, 2020, which stated that the investigation into his sexual assault and rape allegations was complete and that his allegations were determined to be unfounded. (*Id.* at 115; *see also id.* at 154). The letter provided no further instructions, beyond advising Plaintiff to "contact mental health for services related to dealing with victimization." (*Id.* at 154). Plaintiff confirmed that this letter had been given to him. (*Id.* at 116). Plaintiff also explained that he understood from the letter that he had raised allegations and made requests that fell outside the scope of the investigating body, which necessitated the instant civil action. (*Id.* at 117).

C.     **Defendant's Declaration**

Defendant submitted a signed declaration, under penalty of perjury, executed on August 8, 2024, in which Defendant explains that, on April 17, 2020, Defendant was an employee of the Delaware Department of Corrections (DDOC) who held the rank of Corporal and was assigned to work in the SCI property room, where inmates are strip searched and any property on their person is inventoried and stored. (D.I. 70-1 at 2). That day, Plaintiff was brought into SCI by the Dagsboro Police Department, and once in the property room, Plaintiff appeared to be high and agitated. (*Id.* at 3). A Dagsboro Police Officer relayed to Defendant that he believed Plaintiff had narcotics on his person. (*Id.*).

Defendant proceeded to conduct a strip search of Plaintiff in a shower area without other inmates or correctional officers present. (*Id.*). When Defendant instructed Plaintiff on how to get into position for a visual anal cavity search, Plaintiff initially did not fully comply with Defendant's orders, and then when Plaintiff did comply, Defendant "saw a white item the size of a marble protruding from [Plaintiff's] anus." (*Id.*). Defendant ordered Plaintiff to remove the item and to throw it on the floor, but instead, Plaintiff turned around and covered himself with his hand. (*Id.*). Defendant then ordered Plaintiff to get into position for a visual anal cavity search again, and this

time, Plaintiff complied, but Defendant did not observe the white item. (*Id.* at 4). Defendant did not utilize a canine during any search. (*Id.*).

Defendant then informed a Staff Lieutenant who was the Watch Commander that Plaintiff was being evasive, and that Defendant had seen a white item in Plaintiff's anal cavity that disappeared. (*Id.*). The Staff Lieutenant ordered for Plaintiff to be transported to the hospital, and Plaintiff was placed in the receiving room to await transport. (*Id.*). Defendant estimates that Plaintiff waited in the receiving room for forty-five minutes and that he was in transit to the hospital for approximately forty minutes. (*Id.*). Defendant did not accompany Plaintiff during this time, while Plaintiff was at the hospital, or upon Plaintiff's return from the hospital. (*Id.* at 4-5).

### D.    **Defendant's Incident Report**

In an SCI incident report, dated July 19, 2023, Defendant states that on April 17, 2020, Plaintiff was brought into SCI by the Dagsboro Police Department. (D.I. 70-3 at 2). A Dagsboro Police Officer asked for Plaintiff to be strip searched while the Officer was still at SCI, and Defendant complied. (*Id.*). Plaintiff was evasive "when told to bend at the waist and spread his che[e]ks," but when he finally complied, Defendant "witnessed something white in his anus." (*Id.*). Defendant ordered Plaintiff "to take out whatever it was and throw it on the floor," but instead, Plaintiff "turned around and kept his left hand around by his buttocks." (*Id.*). Plaintiff "was ordered again to bend over," and when Plaintiff complied, "he was still evasive," but Defendant "didn't see anything at that time." (*Id.*). Defendant then notified the Watch Commander. (*Id.*). Plaintiff was then "transported to outside hospital for an x-ray." (*Id.* at 4).

### II.    **LEGAL STANDARDS**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue

5

of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Where the burden of persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

The court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true . . . ." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). If "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.* at 1081 (internal quotation marks omitted). Conversely,

> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations, quotations, and alterations omitted). The same standards and burdens apply on cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

### III.   DISCUSSION

#### A.   Exhaustion of Administrative Remedies

As a threshold matter, Defendant argues that Plaintiff failed to exhaust his administrative remedies, and that summary judgment is warranted on that basis. (D.I. 70 at 16). Specifically, Defendant asserts that Plaintiff submitted a grievance, which was returned unprocessed to Plaintiff with instructions to write to his Unit Commander, but no evidence of record indicates that Plaintiff followed up with the Unit Commander, and Plaintiff stated in deposition that he does not recall

7

writing to the Unit Commander, writing to the Operations Superintendent, or appealing to the Warden. (*Id.*). In response, Plaintiff asserts that he "completed the grievance process as he wa[s] told." (D.I. 77 at 1).

The Prison Litigation Reform Act of 1995 (PLRA) prevents prisoners from filing suit with respect to prison conditions under Section 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under the PLRA, prisoners must exhaust all available administrative remedies at the prison level before bringing suit. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007). To properly exhaust his administrative remedies, an inmate must "complete the administrative review process" in compliance with all applicable procedural rules prior to filing suit in federal court. *Woodford*, 548 U.S. at 88. In other words, inmates must avail themselves of "all steps the agency holds out." *Id.* at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). The exhaustion requirement applies to all inmates seeking "redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002).

Whether a prisoner has properly exhausted a claim requires an evaluation of the "prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials." *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004). The "prison grievance procedures supply the yardstick for measuring procedural default." *Id.* at 231. Therefore, the inmate grievance procedures created by the DDOC, and in use at SCI, measure whether Plaintiff's claims are procedurally defaulted. *See id.*

Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. 199, 211-17 (2007); *Small v. Camden Cnty.*, 728 F.3d 265, 268 (3d Cir. 2013). Failure

8

to exhaust administrative remedies must be pled and proved by the defendant. *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). When a defendant shows that a plaintiff inmate did not exhaust administrative remedies, the plaintiff has the burden of showing that administrative remedies were not available. *Id.* Factual disputes about exhaustion are issues for the court to decide, but only after notice and an opportunity for the parties to submit relevant materials. *Id.* at 265.

To review, the record reflects that Plaintiff submitted at least two grievances related to the incident in question, both of which were returned unprocessed. (D.I. 70-4 at 105-11, 148-152). In the return of Plaintiff's April 21, 2020 grievance, Plaintiff was informed that the matter would be referred for further investigation by the Investigations Office. (*Id.* at 149). The return also instructed Plaintiff to write to the Unit Commander to place a request for the actions of staff personnel to be investigated, and then to appeal to the Operations Supervisor or Warden if the response from the United Commander was unsatisfactory. (*Id.*). In his depositin, Plaintiff could not recall if he wrote to the Unit Commander, Operations Supervisor, or Warden regarding an investigation of staff personnel actions, but he did recall awaiting the outcome of the Investigation Office's investigation into the claims stated in his grievance. (*Id.* at 107-08).

Plaintiff later received a letter, dated May 21, 2020, stating that a PREA investigation into Plaintiff's allegations was complete and that the investigation determined Plaintiff's PREA claims to be unfounded. (*Id.* at 115, 154). Plaintiff testified that he understood this to mean that his allegations fell outside the scope of a PREA investigation. (*Id.* at 117). The letter provided no further instructions, beyond advising Plaintiff to "contact mental health for services related to dealing with victimization." (*Id.* at 154).

9

Plaintiff then filed another grievance, dated January 3, 2022, in which he attempted to raise non-PREA claims related to the incident in question. When this grievance was returned to Plaintiff unprocessed, Plaintiff was again informed that the PREA investigation into his claims had been completed, but Plaintiff was also informed that his grievance request was "beyond the scope of the grievance process," and that if he wished to pursue civil claims, he could do so through the court system. (*Id.* at 152). At his deposition, Plaintiff did not recall whether he submitted other grievances related to the incident. (*Id.* at 114-15).

The foregoing does not demonstrate that Plaintiff did not file other grievances related to the incident in question; likewise, the foregoing does not demonstrate that Plaintiff did not write to the Unit Commander, Operations Supervisor, or Warden. On the other hand, the foregoing does demonstrate that a return of unprocessed grievance advised Plaintiff to pursue non-PREA civil claims related to the incident through the court system, which Plaintiff effectively did with the filing of the instant action. The Court cannot conclude at this stage, based on the evidence presented, that Defendant has proven the affirmative defense of failure to exhaust administrative remedies, and the motion for summary judgment on this ground will be denied.

### B. Fourth Amendment Claim of Unreasonable Search

As Defendant asserts, the Fourth Amendment can apply to bodily searches in prison. *See Parkell v. Danberg*, 833 F.3d 313, 325-26 (3d Cir. 2016). (D.I. 70 at 10). A bodily search is constitutional when it strikes a reasonable balance between the scope of the intrusion and the way it is conducted, on the one hand, and the justification for initiating it and place in which it is conducted, on the other. *Parkell*, 833 F.3d at 326 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). In other words, the "test of reasonableness under the Fourth Amendment" "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.*

Generally, the Court gives "considerable deference" to correctional officers' "justification for initiating" bodily searches, *id.*, because they "must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities," *Parkell*, 833 F.3d at 326 (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012)). Yet where bodily searches are not "reasonably related to legitimate penological interests," or where "substantial evidence in the record [indicates] that the officials have exaggerated their response to these considerations," the ordinary deference to such justifications may not be afforded. *Id.* (quoting *Florence II*, 566 U.S. at 326, 328).

In this case, there appears to be a genuine dispute of material fact regarding Defendant's justification for the searches of Plaintiff's anal cavity after the initial search. Specifically, the Complaint calls into question Defendant's credibility and sincerity in stating, and later maintaining, that Defendant saw a ball of crack cocaine in Plaintiff's anal cavity. (D.I. 2 at 6). In deposition, Plaintiff reiterated that Defendant told Plaintiff and other correctional officers that Plaintiff had "something white in [his] anus, to be sarcastic, smart," as opposed to making the statement sincerely. (D.I. 70-4 at 26). On the other hand, Defendant maintains in his signed and sworn declaration that he saw a white marble-sized object protruding from Plaintiff's anus, and Defendant asserts that Plaintiff appeared high and did not comply with commands during the search, which prolonged the process. (D.I. 70-1 at 2-5). Defendant's statements both regarding what he saw, and Plaintiff's evasiveness are supported by Defendant's incident report, dated July 19, 2023. (D.I. 70-3 at 2-4).

Based on the evidence of record at present, the Court does not conclude that either party's interpretation of events "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. As such, the Court cannot make credibility determinations or

11

weigh the evidence at this stage of the case. *Reeves*, 530 U.S. at 150. Accordingly, the Court cannot grant either party's motion for summary judgment as to Plaintiff's Fourth Amendment claim of unreasonable search.

### C. Eighth Amendment Claim of Sexual Abuse

Although sexual abuse by a corrections officer can constitute a violation of the Eighth Amendment where sufficiently severe or repetitive, not every allegation of sexual abuse is sufficient to raise an Eighth Amendment claim. *See Chavis v. United States*, 597 F. App'x 38, 41 (3d Cir. 2014) (citing *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)). "Even a series of incidents that could be described as 'despicable' that could form the basis of legitimate state tort actions may not rise to the level of an Eighth Amendment violation." *Id.*

The facts alleged here do not appear to rise to the level of an Eighth Amendment violation, even when drawing all reasonable inferences in Plaintiff's favor. According to Plaintiff, Defendant allegedly prompted four follow-up bodily searches of Plaintiff, two of which were visual searches, one of which may have involved a canine sniff search, and the last of which involved a five-to-seven-minute, camera-guided examination of Plaintiff's anal cavity in a hospital setting, for which Defendant apparently was not present. (*See* D.I. 2 at 6; D.I. 70-4 at 95). The foregoing, even if proven true, does not appear to meet the high bar set for Eighth Amendment sexual abuse claims. *See Chavis*, 597 F. App'x at 41. Accordingly, Defendant's motion for summary judgment will be granted as to Plaintiff's Eighth Amendment sexual abuse claim against Defendant.

### D. Eighth Amendment Claim of Inadequate Medical Care

The Complaint alleges that, following the final anal cavity search at the hospital, Plaintiff requested medical treatment, but his request was denied. (D.I. 2 at 7). Yet, in deposition, Plaintiff admitted that Defendant was not present for this final search at the hospital. (D.I. 70-4 at 95). As such, it does not appear that Defendant can be held responsible for any denial of medical treatment

that occurred there. Nowhere else does the Complaint mention Plaintiff requesting and being denied medical treatment. (*See* D.I. 2).

As Defendant asserts, to raise a claim of constitutionally inadequate medical care under the Eighth Amended, Plaintiff must make "a subjective showing" that Defendant was "deliberately indifferent to [Plaintiff's] medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017). (D.I. 70 at 13). Plaintiff cannot make this showing if Defendant did not deny Plaintiff's request for medical treatment and was not even present when Plaintiff's request was made and denied. Accordingly, without even reaching the matter of whether Plaintiff has made "an objective showing" that his medical "needs were serious," the Court will grant Defendant's motion for summary judgment as it pertains to Plaintiff's Eighth Amendment claim of inadequate medical care. *Pearson*, 850 F.3d at 534.

E. **Delaware Constitution Claims**

Upon review of the record, the Court cannot reasonably infer any Delaware Constitution-based claim for damages against Defendant. The Complaint does not specify what provision of the Delaware Constitution has allegedly been violated, and as Defendant asserts, the provision of the Delaware Constitution that protects against unreasonable searches does not create a new cause of action for damages. (D.I. 70 at 14 (citing *Schueller v. Cordrey*, 2017 WL 568344, at *1 (Del. Super. Ct. Feb. 13, 2017) ("[T]he Court will not extend *Bivens* liability to create a new cause of action for damages under Article I, Section 6 of the Delaware Constitution."))). As such, the Court will grant Defendant's motion for summary judgment as it pertains to any Delaware Constitution-based claims for damages against Defendant.

### F. <u>Sovereign Immunity</u>

Defendant also argues that he is entitled to sovereign immunity. (D.I. 70 at 17). The Court agrees; to the extent that Plaintiff intends to the sue Defendant in his official capacity for damages, Eleventh Amendment sovereign immunity prohibits Plaintiff from seeking such relief.

"Absent a state's consent, the Eleventh Amendment bars a civil rights suit in federal court that names the state as a defendant." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981) (citing *Alabama v. Pugh*, 438 U.S. 781, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978) (per curiam)). The State of Delaware has not waived its sovereign immunity under the Eleventh Amendment. *See Jones v. Attorney Gen. of Delaware*, 737 F. App'x 642, 643 (3d Cir. 2018) (per curiam). Furthermore, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). This is the case because § 1983 permits suits only against "persons," *id.*, and "state officials acting in their official capacities are not 'persons' under § 1983." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996).

The exclusion of state officials acting in their official capacities from the definition of "persons" under § 1983 provides Delaware state officials with immunity, by way of Delaware's sovereign immunity, such that damages are unavailable under § 1983 when Delaware state officials are sued in their official capacities. *See id.* Although a suit seeking prospective injunctive relief can be brought against state officials in their official capacities under § 1983, *see Merritts v. Richards*, 62 F.4th 764, 771-73 (3d Cir. 2023), the Complaint does not seek prospective injunctive relief. As such, Defendant's motion for summary judgment will be granted as it pertains to claims made against Defendant in his official capacity for damages.

### G. Qualified Immunity

Finally, Defendant argues that he is entitled to qualified immunity. (D.I. 70 at 17-19). Yet the parties appear to dispute facts material to a determination of whether qualified immunity applies. Specifically, the parties dispute whether Defendant sincerely thought he saw a ball of crack cocaine in Plaintiff's anal cavity during Plaintiff's initial body search. Should a factfinder later determine that Defendant misrepresented or exaggerated what he observed during the initial search for no legitimate penological reason, qualified immunity may not attach to Defendant's conduct. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)). One could find that a reasonable official would have known that making misrepresentations or exaggerations for no legitimate purpose in the above context violated Plaintiff's clearly established Fourth Amendment rights against an unreasonable search. Based on the foregoing, the Court will deny Defendant's motion for summary judgment as it pertains to qualified immunity.

### IV. CONCLUSION

For the above reasons, the Court will grant Defendant's motion for summary judgment, in part, as it pertains to Plaintiff's Eighth Amendment claim of sexual abuse, Plaintiff's Eighth Amendment claim of inadequate medical care, any Delaware Constitution-based claims for damages against Defendant, and any other claim for damages against Defendant in his official capacity. (D.I. 70). The Court will deny Defendant's motion for summary judgment, in part, as it pertains to Plaintiff's Fourth Amendment claim of unreasonable search, Defendant's administrative exhaustion defense, and Defendant's qualified immunity defense. (*Id.*). The Court will also deny both of Plaintiff's motions for summary judgment. (D.I. 60; D.I. 62). Regarding

Plaintiff's four motions requesting subpoenas (D.I. 68; D.I. 69; D.I. 74; D.I. 76), the Court will deny these motions as untimely under the Scheduling Order. To the extent that Plaintiff believes that they are timely, within thirty (30) days of this opinion, he may renew the motions and explain how they are timely.

      An appropriate Order will be entered.